MICHAEL WALLIN, Cal. Bar No. 240344
WALLIN & RUSSELL LLP
26000 Towne Centre Drive, Suite 130
Foothill Ranch, California 92610
Telephone:  949-652-2200
Facsimile:  949-652-2210
mwallin@wallinrussell.com

MATTHEW G. MRKONIC
MICHAEL J. HUGET
RAECHEL T.X. CONYERS
HONIGMAN LLP
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226
Telephone:  313-465-7614
mmrkonic@honigman.com
mhuget@honigman.com
rconyers@honigman.com

Attorneys for Plaintiff
BLUE LINE FOODSERVICE DISTRIBUTION, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE LINE FOODSERVICE DISTRIBUTION, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOHN CATHCART, NERYS LOGISTICS, INC., MERCATOR CAPITAL ADVISORS INC., <br><br> Defendants. | Case No. **'24CV1250 W    MMP** <br><br> **COMPLAINT FOR:** <br><br> **(1) FRAUDULENT TRANSFER OF ASSETS;** <br><br> **(2) COMMON LAW FRAUDULENT CONVEYANCE; AND** <br><br> **(3) ALTER EGO LIABILITY** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Blue Line Foodservice Distribution, Inc. ("Plaintiff" or "Blue Line"), by and through its undersigned counsel, files this Complaint against Defendants John Cathcart ("Cathcart"), Nerys Logistics, Inc. ("Nerys Logistics"), and Mercator Capital Advisors Inc. ("Mercator") (collectively "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This case is about Defendants' orchestrated scheme to undermine and evade the $6 million judgment that the United States District Court of the Eastern District of Michigan entered against Comercializadora Nerys De Mexico S.A. DE C.V. ("Com Nerys") and Nery's USA Inc. ("Nerys").

2. Defendants engaged in fraudulent and voidable transactions and otherwise disregarded the corporate form to siphon money from the judgment debtors to themselves.

3. This Court's intervention is critical to remedy the substantial harm caused by Defendants' wrongful actions and to ensure that the Michigan Court's judgment is enforced and collected.

4. Plaintiff Blue Line is an Ilitch company and a nationwide U.S. food distributor, as well as a restaurant equipment and restaurant supply provider.  In 2012, Blue Line entered into a distributor agreement (the "Agreement") with Nerys and Com Nerys.

5. When Nerys and Com Nerys breached the Agreement, Blue Line filed for arbitration, which resulted in a $6 million arbitration award in favor of Blue Line and against Nerys and Com Nerys.  A Michigan Federal District Court entered that arbitration award as a final judgment in October, 2020 (the "Judgment").

6. Nerys and Com Nerys failed to pay the Judgment.

7. Accordingly, Blue Line opened a debtors examination action in the Southern District of California where both Nerys and Com Nerys agreed that personal jurisdiction existed.

8.      Through post-judgment discovery, Blue Line uncovered that Defendant Cathcart, the majority owner, CEO, and CFO of Nerys, had under-capitalized Nerys and Com Nerys, disregarded the corporate form, and transferred money through a maze of related entities, Defendants here, to enrich himself and evade the Judgment.

9.      Indeed, at Cathcart's direction, Nerys and Defendants willfully and fraudulently transferred a substantial amount of Nerys's assets for grossly low or even no consideration at all, with the goal of defrauding Blue Line and thwarting its ability to enforce the Judgment against Nerys and Com Nerys.

## PARTIES, JURISDICTION, AND VENUE

10.      Plaintiff Blue Line is a Michigan corporation with its principal place of business at 2211 Woodward Avenue, Detroit, Michigan 48201.

11.      Defendant Nerys Logistics is a Nevada corporation, and the address of its registered agent is 916 Southwood Blvd, Ste 1A, Incline Village, Nevada, 89451, with a warehouse in San Diego, California.  Upon information and belief, Nerys Logistics is the parent corporation of Nerys.  Nerys Logistics was at all relevant times formed, owned, operated, controlled, and dominated by Cathcart, was and is the alter ego of Cathcart, was and is united in interest with Cathcart, was and is subject to Cathcart's effective direction and control, and was and is operated by Cathcart as his alter ego.

12.      Defendant Mercator is a Nevada corporation, and the address of its registered agent is 916 Southwood Blvd, Ste 1A, Incline Village, Nevada, 89451.  Mercator was at all relevant times formed, owned, operated, controlled, and dominated by Cathcart, was and is the alter ego of Cathcart, was and is united in interest with Cathcart, was and is subject to Cathcart's effective direction and control, and was and is operated by Cathcart as his alter ego.

13.      Defendant John Cathcart is the majority shareholder of Nerys, and the sole shareholder of Mercator.  Additionally, Cathcart is a shareholder of Nerys Logistics and until

-2-

June, 2022 was the sole officer of Nerys Logistics.  Upon information and belief, Cathcart resides in Incline Village, Nevada.  Upon information and belief, Nerys, Mercator, and Nerys Logistics were at all relevant times formed, owned, operated, controlled, and dominated by Cathcart, were and are the alter egos of Cathcart, were and are united in interest with Cathcart, were and are subject to Cathcart's direction and control, and were and are operated by Cathcart as his alter egos.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states, such that Plaintiff does not have the same citizenship as any Defendant.

15.     The Court has personal jurisdiction over Defendants Nerys Logistics, and Mercator because they have at all relevant times purposefully availed themselves of the privilege of conducting business in the State of California and in this judicial district.

16.     The Court has personal jurisdiction over Defendant Cathcart because at all relevant times he has acted in his capacity as the sole officer and majority shareholder of Nerys. Blue Line's claims arise out of Cathcart's actions purposefully directed at this forum on behalf of Nerys in transacting business in this judicial district in connection with the fraudulent transfers of assets alleged in this Complaint.  Cathcart was transacting business in this judicial district to effectuate fraudulent transfers alleged in this Complaint.  Accordingly, Cathcart purposefully availed himself of the privileges and benefits of conducting business in the State of California and in this judicial district in connection with the fraudulent transfers of assets alleged in this Complaint.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial portion of the conduct giving rise to the claim, occurred in this judicial district, including the

Defendants' transacting of business in this judicial district in connection with the fraudulent transfers alleged in this Complaint.

## STATEMENT OF FACTS

**A.     Blue Line Secured a Judgment Against Nerys and Com Nerys**

18.     Plaintiff Blue Line is an Ilitch company and a nationwide U.S. food distributor, as well as a restaurant equipment and restaurant supply provider.

19.     In 2012, Blue Line entered into a five-year distributor agreement (the "Agreement") with Com Nerys and Nerys.

20.     Under the Agreement, Com Nerys became Blue Line's preferred distributor for Little Caesars franchise restaurants in Mexico.  Nerys was the Guarantor for Com Nerys's contractual obligations.

21.     During the term of the parties' Agreement, Com Nerys and Nerys made approximately $90 million in gross profits.

22.     Com Nerys and Nerys subsequently breached the Agreement.  As a result, in 2018, Blue Line brought an arbitration proceeding with the American Arbitration Association ("AAA") against Com Nerys and Nerys (the "Arbitration").

23.     Blue Line ultimately obtained a $6 million award in the arbitration proceeding.

24.     On October 5, 2020, the United States District Court of the Eastern District of Michigan entered the arbitration award as a final judgment.  The Court's Entry of Judgment is attached as **Exhibit A.**

**B.     Blue Line Discovers Cathcart Diverted Funds to Various Entities Under His Control To Evade the Judgment**

25.     Nerys and Com Nerys failed to pay the Judgement.

26.     Blue Line then initiated post-judgment discovery to enforce and collect on its Judgment by registering the judgment in the United State District Court of the Southern District of California.

27.     In post-judgment discovery, Nerys and Com Nerys claimed to have virtually no assets—despite making over $90 million in gross profits during the term of the Agreement.

28.     Indeed, as of the filing of this lawsuit, Nerys and Com Nerys have not satisfied any part of the $6 million judgment against them.

29.     Through post-judgment discovery, Blue Line discovered how Nerys and Com Nerys improperly transferred funds and otherwise disregarded the corporate form to try to evade the judgment and leave Nerys and Com Nerys as empty, uncollectable shells.

30.     Blue Line's post-judgment discovery, including taking the deposition of John Cathcart, Nerys's majority shareholder, CEO, and CFO, and obtaining relevant bank records.

31.     In his deposition, Cathcart admitted that Nerys was under-capitalized and not profitable.  In fact, by 2019, Cathcart had to loan Nerys money to pay for its attorneys' fees in the Arbitration because Nerys did not have sufficient funds to cover the cost. *See* **Exhibit B**, Cathcart Dep. Tr. at 22:4-21.

32.     In fact, by 2019, Cathcart testified that he loaned Nerys money to pay for the attorneys' fees of the Arbitration because Nerys did not have sufficient funds to cover the cost. *Id*. at 7:6-13, 9:17-10:1.

> **Q**: Okay. And why did you decide to transfer $24,000 to Nery's at the time?
> **A**: Nery's had to participate in that arbitration. I guess the alternative would have been to ignore it.  I was given the bill and told I had to paid [sic] it.  And the company did not have the money. So I loaned the money to Nery's to pay its legal bills.
> ***
> **Q**: Okay. Can you estimate approximately how long before [April 2019] Nery's was short on cash?
> **A**: It – it never did extremely well, never made a lot of money. Its – its margins were very thin in the – in the business it was in.  That would have been a struggle

to pay a legal bill at any time in its history.  But I – I – I couldn't, without going back, recall how far back before it had really any money.

*Id.*

33.     Yet, through post-judgment discovery, Blue Line discovered that Com Nerys and Nerys diverted substantial funds to Mercator and Nerys Logistics ("the Cathcart Entities") and that Cathcart used the judgment debtors to pay certain personal expenses.

34.     Nerys Logistics was formed by Cathcart in 2011, and Cathcart was the sole officer of Nerys Logistics until June, 2022.

35.     Nerys Logistics had no written contract with Nerys or Com Nerys or any other documentation whatsoever to substantiate any claimed services that could justify the transfer of funds.

36.     As an example, Cathcart testified that in 2019, Nerys was transferring money to Nerys Logistics, a company Cathcart owned, but that Cathcart didn't know what services, if any, that Nerys Logistics was providing Nerys.  **Exhibit B**, Cathcart Dep. Tr. 40:3-25.

37.     Moreover, Nerys Logistics stopped doing business in 2017—the same year Blue Line terminated its relationship with Nerys and Com Nerys and shortly before Blue Line initiated its arbitration against Nerys and Com Nerys.

38.     During the Arbitration—and years after Nerys Logistics stopped doing business— Cathcart continued to transfer money from Nerys to Nerys Logistics. **Exhibit B**, Cathcart Dep. Tr. 41:4-16.

39.     Cathcart also transferred funds from Nerys to Mercator to use for his personal benefit.

40.     Cathcart is the President and sole shareholder of Mercator.  Cathcart formed Mercator in 2012, the same year Nerys and Com Nerys signed a contract with Blue Line.

41.     Cathcart testified during post-judgment discovery that Nerys and its parent company, Nerys Logistics, transferred thousands of dollars weekly to Mercator, allegedly for consulting, management, and other fees.

42.     These funds were then transferred to Cathcart.

43.     There is no written contract or agreement or other documentation to support the more than $25,000 per month that Nerys and Nerys Logistics transferred to Mercator, which was then transferred to Cathcart.

44.     According to Cathcart's own testimony, during Nerys and Com Nerys's relationship with Blue Line, Cathcart personally received several hundred thousand dollars from Nerys for supposed "management fees" which were filtered through Mercator.

> **Q**: Okay. So how much money in total do you believe that – that Nery's USA transferred to Mercator Capital?
> **A**: Since the inception?
> **Q**: Yeah.
> **A**: Over the –let's call it the 10 years, two to $300,000.
> **Q**: Okay. And I see that there was this $900 transfer in November 2020.  Would you say the bulk of that two to $300,000 was paid to Mercator, you know, in 2011, 2012, 2013? Or is the bulk of it paid in 2018, '19, '20?
> **A**: Bulk of it would have been twenty, you know '15, '16, '17.
> **Q**: How much money did Nery's USA transfer to you personally?
> **A**: Well, that two to $300,000.

**Exhibit B**, Cathcart Dep Tr. at 58:12-59:4.

45.     Mercator's bank statements also show numerous online bank transfers from Mercator to Cathcart's personal account for personal expenses.

46.     For example, Mercator's bank statements show a $6,860 purchase at Fantasy Diamonds, a jeweler in New York.  And Mercator also made monthly transfers to Cathcart's wife and adult children.

47.     These money transfers were all funded by Nerys, and effectuated through the Cathcart Entities.

48.     Blue Line expects discovery in this action to uncover additional evidence of wrongful acts by the Cathcart Entities, Cathcart, and the judgment debtors.

**C.     The Cathcart Entitles are Cathcart's Alter Ego**

49.     An alter ego exists when there is, as seen here, such a unity of interest and ownership between the person and the alter ego defendant that their separate personalities no longer exist; and the facts are such that if the privilege of separate existence is recognized, an inequitable result will follow.

50.     Here, Cathcart fleeced money from Com Nerys and Nerys by making various transfers to the Cathcart Entities.  Cathcart used the Cathcart Entities as mere instrumentalities to evade paying Blue Line by transferring money between the Cathcart Entities for his own personal use.

51.     The fraudulent transfers made between the Cathcart Entities made it impossible for Blue Line to effectuate the Judgement.

52.     By the time Blue Line attempted to collect the money Judgment from Nerys and Com Nerys, they were inadequately capitalized and unable to pay their debts.

53.     Put simply, Cathcart was required to effectuate the Judgment to Blue Line through the debtor businesses he controlled.  But Cathcart claimed the debtor businesses did not have sufficient assets to pay the Judgment.  Cathcart's continuous money transfers through the Cathcart Entities belie this claim.

**FIRST CLAIM FOR RELIEF – AGAINST ALL DEENDANTS**
**FRADULENT TRANSFER (CAL. CIV. CODE § 3439.04)**

54.     Blue Line realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

55.     Blue Line received a Judgment against Com Neys and Nerys.

56.     Therefore, as described above, at all relevant times, Blue Line is a creditor of Com Nerys and Nerys, debtors that remain liable for Blue Line's Judgment.

57.     Cathcart and his alter egos' money transfers to Mercator and Nerys Logistics were fraudulent under California Uniform Voidable Transactions Act.

58.     The purpose of the conveyance to Mercator and Nerys Logistics was to unlawfully spend the money owed to Blue Line to delay and hinder Blue Line's receipt of the money Judgment.

59.     Cathcart profited by hundreds of thousands of dollars without providing any services in exchange for the money he received from the Cathcart Entities.

60.     These conveyances ultimately led to the under-capitalization of Nerys.

61.     Each of these transfers, transactions and other conduct described was made with the actual intent to hinder, delay, or defraud Blue Line.

**SECOND CLAIM FOR RELIEF – AGAINST ALL DEENDANTS**
**COMMON LAW FRAUDULENT CONVEYANCE**

62.     Blue Line realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

63.     Blue Line received a Judgment against the Nerys and Com Nerys.

64.     Therefore, as described above, at all relevant times, Blue Line is a creditor of Com Nerys and Nerys, debtors that remain liable for Blue Line's Judgment.

65.     During the term of the Agreement, Cathcart and his alter egos fraudulently transferred money to Mercator and Nerys Logistics.

66.     The purpose of the transfers was to delay and hinder Blue Line's receipt of the money Judgment and/or other actual and potential liabilities of the companies.

67.     Cathcart and the Cathcart Entities received funds and otherwise profited from the judgment debtors without providing any services or other value in exchange.

68.     These conveyances ultimately led to the under-capitalization of Nerys and Com Nerys, and each of these transfers, transactions and other conduct described was made with the actual intent to hinder, delay, or defraud Blue Line.

### THIRD CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS
### ALTER EGO / PIERCING THE CORPORATE VEIL

69.     Blue Line realleges and incorporates by reference the allegations set forth above as if fully set forth  herein.

70.     The alter ego doctrine arises when a plaintiff claims that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests.  In certain situations, like those present here, the corporate veil can be pierced as a tool of equity to disregard the corporate entity and impose liability on the company's individual shareholders and their personal assets to avoid injustice.

71.     There is a compelling unity of interest and identical ownership between and among the Cathcart Entities and Cathcart such that the separate personalities of the Cathcart Entities and Cathcart does not exist.

72.     Additionally, an inequitable and unjust result will follow if the fraudulent acts are treated as those of Nerys alone.

73.     As a result, the Cathcart Entities and Cathcart should be treated as alter egos of each other and of Nerys and Com Nerys.  Furthermore, the corporate veils of the corporate defendants should be pierced to reach the assets of the Defendant affiliates and shareholders.

//

//

//

//

//

# REQUEST FOR RELIEF

WHEREFORE, Blue Line prays for judgment in its favor and against all Defendants, jointly and severally, as follows:

a.  Compensatory damages in an amount to be determined at trial;

b.  The value of the assets transferred or the amount necessary to satisfy Blue Line's Judgment;

c.  Punitive damages in an amount to be determine at trial;

d.  Avoidance of the transfers to the extent necessary to satisfy Blue Line's Judgment;

e.  An attachment against the transferred assets;

f.  An injunction against further transfer of the assets;

g.  Appointment of a receiver to take charge of the assets;

h.  A levy of execution against the assets or their proceeds;

i.  Prejudgment and post-judgment interest to the extent permitted by law; and

j.  Any further relief this Court deems just and proper.

//

//

//

//

1

Dated:  July 18, 2024

2

WALLIN & RUSSELL LLP

3

4

By: _____ */s/ Michael Wallin*

MICHAEL WALLIN

5

Attorneys for Plaintiff BLUE LINE

6

FOODSERVICE DISTRIBUTION, INC.

7

8

HONIGMAN LLP

9

10

MATTHEW G. MRKONIC (266779)

MICHAEL J. HUGET (PRO HAC VICE

11

FORTHCOMING)

RAECHEL T.X. CONYERS (PRO HAC

12

VICE FORTHCOMING)

HONIGMAN LLP

13

2290 FIRST NATIONAL BUILDING

660 WOODWARD AVENUE

14

DETROIT, MI 48226-3506

TELEPHONE:         313-465-7614

15

FACSIMILE:         313-465-7615

16

17

Attorneys for Plaintiff BLUE LINE

FOODSERVICE DISTRIBUTION, INC.

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Blue Line Foodservice Distribution, Inc., <br><br>          Plaintiff, <br><br>    v. <br><br> Comercializadora Nerys De Mexico S.A. de C.V., Nery's USA Inc., <br><br><br>          Defendants. | Case No. 2:20-cv-11043 <br><br><br> Hon. Sean F. Cox |

## ENTRY OF DEFAULT JUDGMENT

This matter having come before the Court on Plaintiff Blue Line Foodservice Distribution, Inc.'s ("Blue Line") Motion for Default Judgment, the Court hereby enters final default judgment pursuant to Fed. R. Civ. P. 58 and Local Rule 58.1 against Defendants Comercializadora Nerys De Mexico S.A. de C.V. and Nery's USA Inc (collectively, "Defendants").

Accordingly, it is ORDERED AND ADJUDGED that Final Default Judgment is hereby entered in favor of Blue Line and against, jointly and severally, Defendants. Default Judgment is hereby entered against Defendants in the amount

of $6,342,402.63, jointly and severally.

      **SO ORDERED**.

Dated: October 5, 2020

                                              s/Sean F. Cox
                                              Sean F. Cox
                                              U. S. District Judge

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3    _____
                                          )
 4    BLUE LINE FOODSERVICE DISTRIBUTION,  )
      INC.,                                )
 5                         Plaintiff,      )
                                          )
 6    vs.                                 ) Case No.
                                          ) 3:21-MC-00124
 7    COMERCIALIZADORA NERYS DE MEXICO     )
      S.A. DE C.V.; and NERY'S USA, INC., )
 8                                        )
                         Defendants.      )
 9    _____)
10
11
12
13            VIDEOCONFERENCE DEPOSITION OF
14                   JOHN CATHCART
15               (Conducted Remotely)
16             WEDNESDAY, MAY 12, 2021
17                  10:02 A.M. PST
18
19
20
21
22
23
24    Job No.:  4579641
      Reported by:  BRENDA MATZOV, CSR NO. 9243
25    Pages 1 - 76
```

                                              Page 1

1           Videoconference deposition of JOHN
2   CATHCART, taken remotely in the above-entitled
3   cause pending in the United District Court,
4   Southern District of California, before BRENDA
5   MATZOV, CSR NO. 9243, and simultaneously in the
6   participants' remote locations, on Wednesday,
7   the 12th day of May, 2021, at 10:02 a.m. PST.
8
9
10  APPEARANCES:
11  FOR THE PLAINTIFF:
12          WALLIN & RUSSELL, LLP
            By:  MICHAEL A. WALLIN, ESQ.
13          26000 Towne Centre Drive
            Suite 130
14          Foothill Ranch, California 92610
            (949) 652-2202
15          mwallin@wallinrussell.com
16
17  FOR THE EXAMINEE JOHN CATHCART:
18          PARSONS BEHLE & LATIMER
            By:  ZACHARY S. SHEA, ESQ.
19          50 West Liberty Street
            Suite 750
20          Reno, Nevada 89501
            (775) 323-1601
21          zshea@parsonsbehle.com
22
23
24
25

                                        Page  2

| | | |
|---|---|---|
| 1 | Q.   Okay.  And why did Nery's transfer | 10:07:32 |
| 2 | $24,250 to American Arbitration Association? | 10:07:37 |
| 3 | A.   It was in an arbitration resulting | 10:07:42 |
| 4 | in this deposition, this call.  It was the | 10:07:45 |
| 5 | arbitration fees. | 10:07:49 |
| 6 | Q.   Okay.  And why did you decide to | 10:07:50 |
| 7 | transfer $24,000 to Nery's at that time? | 10:07:58 |
| 8 | A.   Nery's had to participate in that | 10:08:03 |
| 9 | arbitration.  I guess the alternative would | 10:08:06 |
| 10 | have been to ignore it.  I was given the bill | 10:08:09 |
| 11 | and told I had to paid it.  And the company | 10:08:12 |
| 12 | did not have the money.  So I loaned the | 10:08:14 |
| 13 | money to Nery's to pay its legal bills. | 10:08:17 |
| 14 | Q.   Okay.  And -- | 10:08:22 |
| 15 | A.   I didn't know any other way to | 10:08:22 |
| 16 | participate.  I'm sorry.  Go ahead. | 10:08:24 |
| 17 | Q.   No problem. | 10:08:26 |
| 18 | When you say that you loaned the | 10:08:27 |
| 19 | money to Nery's, was -- was there at the | 10:08:29 |
| 20 | time a written loan agreement or written | 10:08:31 |
| 21 | evidence that that money was a loan from | 10:08:33 |
| 22 | you to Nery's? | 10:08:35 |
| 23 | A.   Yes.  I believe there's a note | 10:08:37 |
| 24 | that exists. | 10:08:38 |
| 25 | Q.   Okay.  And do you still have access | 10:08:40 |

Page 7

| | | |
|---|---|---|
| 1 | "loans" and kept in a file. | 10:09:54 |
| 2 | Q.   Okay.  So now going back to the April | 10:09:59 |
| 3 | 2019 transfer, I'm assuming -- is it correct | 10:10:01 |
| 4 | that you transferred that money, the $24,000, | 10:10:07 |
| 5 | to Nery's so that Nery's could pay the American | 10:10:08 |
| 6 | Arbitration Association because Nery's didn't | 10:10:13 |
| 7 | have sufficient money on its own to pay the | 10:10:16 |
| 8 | Arbitration Association? | 10:10:20 |
| 9 | A.   That is correct. | 10:10:21 |
| 10 | Q.   Okay.  And was Nery's inability | 10:10:24 |
| 11 | to pay itself a recent phenomenon that arose | 10:10:27 |
| 12 | shortly before April 2019?  Or was Nery's | 10:10:33 |
| 13 | short on cash for a several-month period or | 10:10:36 |
| 14 | longer leading up to April 2019? | 10:10:39 |
| 15 | A.   Nery's had been short on cash for | 10:10:42 |
| 16 | more than a few months prior to that. | 10:10:46 |
| 17 | Q.   Okay.  Can you estimate approximately | 10:10:46 |
| 18 | how long before that Nery's was short on cash? | 10:10:48 |
| 19 | A.   It -- it never did extremely well, | 10:10:51 |
| 20 | never made a lot of money.  Its -- its margins | 10:10:54 |
| 21 | were very thin in the -- in the business it | 10:10:58 |
| 22 | was in.  That would have been a struggle to | 10:11:01 |
| 23 | pay a legal bill at any time in its history. | 10:11:03 |
| 24 | But I -- I -- I couldn't, without going back, | 10:11:06 |
| 25 | recall how far back before it had really any | 10:11:12 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | money. | 10:11:14 |
| 2 | Q.   Did -- in answering the next question | 10:11:16 |
| 3 | or two, don't -- don't tell me anything that | 10:11:21 |
| 4 | Nery's discussed with its attorneys.  But to | 10:11:25 |
| 5 | the extent you can answer it without disclosing | 10:11:28 |
| 6 | anything you disclosed -- talked -- discussed | 10:11:30 |
| 7 | with your attorneys, answer to the best of your | 10:11:31 |
| 8 | ability. | 10:11:35 |
| 9 | In April 2019, when Nery's paid | 10:11:35 |
| 10 | $24,250 to the American Arbitration Association | 10:11:39 |
| 11 | to participate in the arbitration initiated by | 10:11:43 |
| 12 | my client, did Nery's contend that it did not | 10:11:47 |
| 13 | owe money to my client? | 10:11:54 |
| 14 | A.   It believes so.  Yes. | 10:11:57 |
| 15 | Q.   Okay.  And so Nery's intention was | 10:11:59 |
| 16 | to defend itself in the arbitration in the | 10:12:06 |
| 17 | hope that my client would never obtain a | 10:12:09 |
| 18 | judgment against Nery's; is that correct? | 10:12:13 |
| 19 | A.   Correct. | 10:12:14 |
| 20 | Q.   Okay.  If Nery's lacked even $24,000 | 10:12:16 |
| 21 | in April 2019 and had lacked much cash for at | 10:12:24 |
| 22 | least a several-month period before April 2019, | 10:12:29 |
| 23 | why did Nery's -- why did Nery's simply not | 10:12:33 |
| 24 | dissolve at that point or simply ignore this | 10:12:39 |
| 25 | arbitration, as opposed to deciding to defend | 10:12:42 |

Page 10

|    |                                                              |          |
|----|--------------------------------------------------------------|----------|
| 1  | Q.   Okay.  So -- and that was in roughly                    | 10:26:11 |
| 2  | 2017, you said?                                              | 10:26:13 |
| 3  | A.   Yeah.  I believe early 2017.                            | 10:26:14 |
| 4  | Q.   Okay.  And you can go in as much detail                 | 10:26:16 |
| 5  | as you want.  But in simple or -- you know, explain          | 10:26:24 |
| 6  | to me how, in 2017, Nery's seemingly was doing               | 10:26:26 |
| 7  | pretty well if a 24 percent interest was worth               | 10:26:34 |
| 8  | one and a half to \$2 million.                               | 10:26:37 |
| 9  | How did Nery's go from that level                            | 10:26:40 |
| 10 | of success and value to what happened by 2019                | 10:26:42 |
| 11 | where I can see from the bank statements that                | 10:26:46 |
| 12 | it seemingly was doing poorly?  What -- what                 | 10:26:50 |
| 13 | happened?                                                    | 10:26:53 |
| 14 | A.   Well, it was a doing a little bit                       | 10:26:53 |
| 15 | better back in 2017 in its sales.  There were                | 10:26:56 |
| 16 | several prospects of some large distribution                 | 10:26:59 |
| 17 | agreements or customers in Mexico.  So on the --             | 10:27:02 |
| 18 | on the hope that these would all develop, Com                | 10:27:06 |
| 19 | Nerys wanted to -- sorry -- Com Nerys wanted                 | 10:27:12 |
| 20 | to be involved and help, be part of it.  They                | 10:27:16 |
| 21 | were looking to grow.                                        | 10:27:21 |
| 22 | Q.   Okay.  Was it -- you can't get into                     | 10:27:23 |
| 23 | their mind.  But do you believe, to the extent               | 10:27:26 |
| 24 | that you know, that Com Nerys' decision to buy               | 10:27:29 |
| 25 | into the company was based on Nery's performance             | 10:27:33 |

Page 22

| | | |
|---|---|---|
| 1 | am I trying to think of? -- machinery -- | 10:48:48 |
| 2 | equipment to Mexico. | 10:48:48 |
| 3 | Q.   Okay.  Who owns Nery's Logistics, | 10:48:59 |
| 4 | Inc.? | 10:49:03 |
| 5 | A.   I do. | 10:49:04 |
| 6 | Q.   And in 2019 you did also? | 10:49:05 |
| 7 | A.   I believe so.  Yes.  Yes. | 10:49:08 |
| 8 | Q.   Okay.  Are there any written agreements | 10:49:09 |
| 9 | between Nery's USA, Inc., and Nery's Logistics, | 10:49:12 |
| 10 | Inc.? | 10:49:17 |
| 11 | A.   I don't believe so. | 10:49:20 |
| 12 | Q.   Do you know what specifically Nery's | 10:49:21 |
| 13 | Logistics, Inc., did for Nery's USA, Inc., in | 10:49:24 |
| 14 | exchange for this $12,000? | 10:49:27 |
| 15 | A.   Yeah.  It was most likely warehousing | 10:49:29 |
| 16 | services or -- no, I didn't have a warehouse. | 10:49:32 |
| 17 | So no, I -- I'm not sure.  I do not recall. | 10:49:35 |
| 18 | Q.   Okay.  Did -- did Nery's US -- did | 10:49:38 |
| 19 | Nery's Logistics ever have a physical business | 10:49:43 |
| 20 | address? | 10:49:45 |
| 21 | A.   Ever?  No.  It would utilize either | 10:49:51 |
| 22 | my office address in Incline Village, or it | 10:49:57 |
| 23 | would use the -- the warehouse that -- as -- | 10:50:01 |
| 24 | as an address.  But it didn't have physical | 10:50:04 |
| 25 | offices itself. | 10:50:08 |

Page 40

| | | |
|---|---|---|
| 1 | Q.   Okay.  And does Nery's Logistics, | 10:50:09 |
| 2 | Inc., still do business? | 10:50:10 |
| 3 | A.   No. | 10:50:12 |
| 4 | Q.   And roughly when did it stop doing | 10:50:13 |
| 5 | business? | 10:50:16 |
| 6 | A.   2016, 2017. | 10:50:19 |
| 7 | Q.   And why did it stop doing business? | 10:50:24 |
| 8 | A.   I just quit working in Mexico.  I -- | 10:50:29 |
| 9 | I didn't want to keep doing anything there. | 10:50:32 |
| 10 | I was struggling. | 10:50:35 |
| 11 | Q.   Okay.  If Nery's Logistics stopped | 10:50:37 |
| 12 | doing business in 2016 or 2017, then why did | 10:50:39 |
| 13 | it receive $12,000 in 2019? | 10:50:43 |
| 14 | A.   Yeah.  I -- I do not recall right now. | 10:50:47 |
| 15 | I would have to look at the documentation, if | 10:50:49 |
| 16 | I can find it. | 10:50:52 |
| 17 | Q.   Can you please turn to the February | 10:51:17 |
| 18 | 2019 bank statement. | 10:51:19 |
| 19 | A.   Okay.  I'm here. | 10:51:27 |
| 20 | Q.   Okay.  I'm looking at the page JC 11. | 10:51:28 |
| 21 | A.   Okay.  I'm here. | 10:51:34 |
| 22 | Q.   On February 15th, 2019, an entity | 10:51:37 |
| 23 | called TEO [sic] Foods, Inc., transferred | 10:51:41 |
| 24 | $50,000 to Nery's USA. | 10:51:45 |
| 25 | Why did that happen? | 10:51:47 |

Page 41

| | | |
|---|---|---|
| 1 | Q.   Meaning that, if you're a shareholder | 11:19:22 |
| 2 | of a company, you can be entitled to distribution | 11:19:24 |
| 3 | from the company that you own shares in. | 11:19:27 |
| 4 | A.   Yeah.  There were no distributions | 11:19:28 |
| 5 | based on shares. | 11:19:30 |
| 6 | Q.   Okay.  You also acted as a consultant | 11:19:32 |
| 7 | to Nery's USA; correct? | 11:19:41 |
| 8 | A.   Correct. | 11:19:43 |
| 9 | Q.   And that was done through Mercator | 11:19:45 |
| 10 | Capital; right? | 11:19:46 |
| 11 | A.   Yes. | 11:19:49 |
| 12 | Q.   Okay.  So how much money in total do | 11:19:50 |
| 13 | you believe that -- that Nery's USA transferred | 11:19:54 |
| 14 | to Mercator Capital? | 11:19:59 |
| 15 | A.   Since the inception? | 11:20:02 |
| 16 | Q.   Yeah. | 11:20:04 |
| 17 | A.   Over the -- let's call it the 10 years, | 11:20:05 |
| 18 | two to $300,000. | 11:20:08 |
| 19 | Q.   Okay.  And I see that there was this | 11:20:11 |
| 20 | $900 transfer in November 2020. | 11:20:19 |
| 21 | Would you say the bulk of that two | 11:20:23 |
| 22 | to $300,000 was paid to Mercator, you know, | 11:20:26 |
| 23 | in 2011, 2012, 2013?  Or is the bulk of it | 11:20:29 |
| 24 | paid 2018, '19, '20? | 11:20:34 |
| 25 | A.   Bulk of it would have been twenty, | 11:20:35 |

Page 58

| | | |
|---|---|---|
| 1 | you know, '15, '16, '17. | 11:20:39 |
| 2 | Q. How much money did Nery's USA transfer | 11:20:46 |
| 3 | to you personally? | 11:20:52 |
| 4 | A. Well, that two to $300,000. | 11:20:58 |
| 5 | Q. Okay. But outside of that, there | 11:21:00 |
| 6 | were no separate transfers to you individually? | 11:21:03 |
| 7 | A. Oh, no -- I'm sorry. Individually? | 11:21:06 |
| 8 | Q. Yes. | 11:21:08 |
| 9 | A. If I paid for something personally, | 11:21:09 |
| 10 | I would have expensed -- expensed it personally. | 11:21:11 |
| 11 | If Mercator paid for something, like the fee we | 11:21:15 |
| 12 | just talked about, it would have paid Mercator. | 11:21:18 |
| 13 | So to me personally in expenses, thousands of | 11:21:22 |
| 14 | dollars. But, you know, I -- I can't even | 11:21:27 |
| 15 | imagine -- less than $10,000. | 11:21:32 |
| 16 | Q. Okay. And all of that was expense | 11:21:34 |
| 17 | reimbursement, meaning you paid -- | 11:21:35 |
| 18 | A. Correct. | 11:21:37 |
| 19 | Q. -- an actual hard cost on behalf of | 11:21:37 |
| 20 | the company? | 11:21:39 |
| 21 | A. Correct. | 11:21:40 |
| 22 | Q. Okay. What about relatives of yours, | 11:21:40 |
| 23 | did Nery's USA -- are you married? | 11:21:42 |
| 24 | A. Yes. | 11:21:46 |
| 25 | Q. Did Nery's USA ever transfer any money | 11:21:47 |

Page 59